RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 15a0236p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

FARRIS GENNER MORRIS,

       *Petitioner-Appellee/Cross-Appellant,*

  *v.*

WAYNE CARPENTER, Warden,

       *Respondent-Appellant/Cross-Appellee.*

Nos. 11-6322/6323

Appeal from the United States District Court
for the Western District of Tennessee at Jackson.
No. 1:07-cv-01084—J. Daniel Breen, Chief District Judge.

Argued: March 3, 2015

Decided and Filed: September 23, 2015

Before: BOGGS, SILER, and CLAY, Circuit Judges.

_____

**COUNSEL**

**ARGUED:** Jennifer L. Smith, OFFICE OF THE TENNESSEE ATTORNEY GENERAL, Nashville, Tennessee, for Appellant/Cross-Appellee. Jerome C. Del Pino, OFFICE OF THE FEDERAL PUBLIC DEFENDER FOR THE MIDDLE DISTRICT OF TENNESSEE, Nashville, Tennessee, for Appellee/Cross-Appellant. **ON BRIEF:** Andrew Hamilton Smith, OFFICE OF THE TENNESSEE ATTORNEY GENERAL, Nashville, Tennessee, for Appellant/Cross-Appellee. Jerome C. Del Pino, Paul R. Bottei, OFFICE OF THE FEDERAL PUBLIC DEFENDER FOR THE MIDDLE DISTRICT OF TENNESSEE, Nashville, Tennessee, for Appellee/Cross-Appellant.

---

**OPINION**

---

SILER, Circuit Judge. Warden Wayne Carpenter ("Carpenter") appeals the district court's order granting Farris Genner Morris's ("Morris") petition for a writ of habeas corpus in part and vacating his death sentence on the basis of ineffective assistance of counsel at sentencing. Morris cross-appeals the district court's decision to deny his claims of ineffective assistance of counsel in the guilt phase. For the following reasons, we **AFFIRM** the district court's denial of Morris's claim of ineffective assistance of counsel in the guilt phase, **VACATE** the district court's grant of habeas relief on Morris's claim of ineffective assistance of counsel in the sentencing phase, and **REMAND** to the district court.

**FACTUAL BACKGROUND**

The Tennessee Supreme Court summarized the facts of the case as follows:

*Guilt Phase*

Charles and Angela Ragland lived in a duplex residence in Jackson, Tennessee. The defendant, Farris Genner Morris, lived with his wife in the adjoining residence.

In the early morning hours of September 17, 1994, Angela Ragland arrived at her home along with her 15-year-old cousin, Erica Hurd. Charles Ragland was awake in the bedroom with the light on. Shortly after arriving, Erica went outside to retrieve something from the car. When Erica came back into the house, Angela heard a scream and saw that Morris was holding a shotgun to Erica's head.

Morris pushed Erica onto the bed in the Raglands' bedroom and asked Charles "where the dope was." Charles Ragland replied that he "didn't have any" and asked Morris if he wanted money.FN4 After Morris responded that he would "find it himself," Morris fired a shot into the floor and ordered Charles Ragland to get on the floor. He placed a pillow on Ragland's head and shot him one time in the head.

FN4. Angela Ragland testified that her husband did not sell or use drugs.

Morris ordered Erica to get into a closet by threatening to "blow her head off." He forced Angela into another bedroom, tied her wrists and ankles, and covered the window with a mattress so that "nobody could see if they walked by." Morris then retrieved Erica from the closet. Angela Ragland testified that she heard Erica

pleading for Morris not to kill her and that she heard Morris say "shut up." She testified that she heard Erica screaming and gasping for breath, and then silence.

Morris returned to the bedroom and, still holding the shotgun, forced Angela Ragland to bathe him. Afterward he ordered Angela to put on a negligee and make him something to eat, which she did. Morris then forced Angela to have sexual intercourse with him "three or four times" and to perform oral sex upon him. Morris told her that he had once been "accused of raping someone and . . . if he was going to jail, he was going to go to jail for doing something." He told Angela that "society made him the way he was" and "was the reason that he was doing what he did."

Around 6:30 a.m., Morris heard his wife in the adjoining residence and told Angela that he would let her go. He instructed her to tell police that she found the bodies of her husband and cousin when she arrived home that morning. Morris used a cloth to wipe off objects he had touched and he warned Angela not to go to the police. Angela fled to the house of a nearby friend, who drove her to the police station. The police found Morris at his home shortly thereafter and arrested him.

The bodies of Charles Ragland and Erica Hurd were later discovered in the Ragland residence. Charles Ragland had been shot in the head. Erica Hurd had been beaten and stabbed repeatedly. A blood-stained steak knife was found behind a couch and a large butcher knife with traces of blood was found in a chair in the living room. Angela Ragland testified that neither knife belonged to her or her husband. A 12-gauge pistol grip, pump action shotgun was later found underneath Morris's dresser drawer.

After being advised of and waiving his constitutional rights, Morris gave a statement to Officers Patrick Willis and James Golden of the Jackson Police Department.[] Morris said that on the day of the offense he had purchased and smoked $250 worth of cocaine. He admitted that he had an exchange with Charles Ragland at 1:00 a.m., just a few hours prior to the murders, in which he asked Ragland to sell him drugs and, when Ragland declined, told Ragland that "he was going to regret disrespecting me." Morris admitted that he went to his house, got his shotgun, loaded two shells into the shotgun, and waited for Ragland's wife, Angela, to get home. Morris admitted that he entered the Ragland's residence with the shotgun and demanded that Charles Ragland sell him drugs. He admitted that after Ragland said he didn't have any drugs, he fired a shot into the floor, put a pillow over the barrel of the gun and shot him in the head. Morris admitted that he put Erica Hurd in a closet and tied up Angela Ragland. Morris told officers that he intended only to tie up Erica Hurd but that he stabbed her because she acted crazy and they struggled over a knife. Morris admitted he had sexual intercourse and oral sex with Angela Ragland.

Dr. O.C. Smith, the Deputy Chief Medical Examiner for West Tennessee, testified that Charles Ragland died from a shotgun wound to the head. Dr. Smith testified that he found evidence of an "intermediate target" between the weapon and

Ragland's head, but that Ragland's death was "instantaneous because the brain [was] destroyed."

Dr. Smith testified that Erica Hurd had died as a result of multiple injuries including, stab wounds, blunt trauma to the head, skull fractures, and damage to the brain. Dr. Smith found that there were 37 stab wounds, 23 of which were sustained prior to death and 14 of which were post-mortem. Dr. Smith testified that 25 of the stab wounds were to the victim's neck and face and that the force of the stabbings was great enough to cause the knife blades to bend upon striking bone.

The defense theory focused on Morris's use of crack cocaine. In addition to Morris's own statement to police, Russell Morris, the defendant's brother, testified that he saw the defendant smoking crack around 5:15 p.m. on the evening before the murders.

. . . .

The jury convicted Morris of two counts of premeditated first degree murder and one count of aggravated rape.

*Penalty Phase*

Dr. O.C. Smith again testified regarding his findings from the autopsy of Erica Hurd, including the blunt trauma, skull fractures, and 37 stab wounds. Dr. Smith said that the wounds would have been painful and that the stab wounds that struck bone would have caused severe pain. Dr. Smith explained that the wounds were "in areas that may be targeted, the face, the head, the chest, the back," and that they showed "sites of selection, as opposed to a random pattern of distribution." Dr. Smith, noting that some of the wounds were severe and others were superficial, testified that it "may imply an element of control . . . or it may imply an element of torment by being very superficial in nature."

Several witnesses testified on behalf of the defendant. Mickey Granger, the defendant's employer, testified that Morris was a good, dependable employee who suffered a "downhill slide" in performance when accused of rape shortly before these offenses. Granger became aware of Morris's drug problem when he found a crude crack pipe fashioned from a soft drink can.

Jack Thomas, a friend of the defendant's, testified that when he visited Morris in prison, Morris admitted his responsibility for the killings but denied that he raped Angela Ragland. According to Thomas, Morris said that he had used a large amount of cocaine on the night of the offenses in an effort to overdose. Several other witnesses, including teachers and prison employees, testified that Morris is a good student, participates in class, and is punctual. Several of the witnesses testified that Morris helps others [sic] inmates, studies frequently, and uses reference material from the library. The defendant did not testify.

The jury imposed a death sentence for the first degree murder of Erica Hurd after finding that the evidence of two aggravating circumstances—that the murder was "especially heinous, atrocious or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death," and that the murder was "committed while the defendant was engaged in committing . . . any first degree murder, rape, burglary or kidnapping"—outweighed mitigating evidence beyond a reasonable doubt. *See* Tenn. Code Ann. § 39-13-204(i)(5) and (7).

The jury imposed a sentence of life without parole for the murder of Charles Ragland after finding that the evidence of two aggravating circumstances—that the defendant "knowingly created a great risk of death to two or more persons other than the victim murdered during the act of murder" and that the murder was committed while the defendant was engaged in committing any "first degree murder, rape, burglary or kidnapping"—did not outweigh mitigating evidence beyond a reasonable doubt. Tenn. Code Ann. § 39-13-204(i)(3) and (7). In a separate sentencing hearing, the trial court imposed a 25-year sentence for the aggravated rape conviction and ordered that it be served consecutively to the sentence of life without parole.

*State v. Morris*, 24 S.W.3d 788, 792-94 (Tenn. 2000).

## PROCEDURAL HISTORY

The Tennessee Court of Criminal Appeals affirmed Morris's convictions and sentences, *State v. Morris*, No. 02C01-9801-CC-00012, 1999 WL 51562 (Tenn. Crim. App. Feb. 5, 1999), the Tennessee Supreme Court affirmed, *Morris*, 24 S.W.3d at 816, and the United States Supreme Court denied certiorari, *Morris v. Tennessee*, 531 U.S. 1082 (2001). In 2001, Morris filed a state post-conviction petition, and after an evidentiary hearing, the trial court denied the petition. In 2006, the Tennessee Court of Criminal Appeals affirmed that decision. *Morris v. State*, No. W2005-00426-CCA-R3-PD, 2006 WL 2872870 (Tenn. Crim. App. Oct. 10, 2006).

In 2007, Morris filed a pro se petition for a writ of habeas corpus. The district court appointed counsel, and counsel filed an amended petition in 2008. Morris raised claims of ineffective assistance of counsel in the pretrial, guilt, and sentencing phases of trial and on appeal. He claimed that the trial court violated his rights against self-incrimination, to a jury drawn from a fair cross section of the community, to a fair and impartial jury, and to due process. He also alleged that the prosecution violated his rights to due process, exculpatory evidence in its possession, a jury drawn from a fair cross section of the community, and a fair and impartial

jury. Finally, Morris claimed that the selection of the foreperson of the grand jury and the deliberations of the petit jury violated his constitutional rights.

The district court denied Morris's request for an evidentiary hearing and granted the state's motion for summary judgment in part and denied it in part. It found that Morris received ineffective assistance of counsel in the sentencing phase and granted him a conditional writ, but it denied Morris's other claims and denied him a certificate of appealability ("COA").

We granted a COA on Morris's claim that trial counsel was ineffective in the guilt phase for failing to investigate and to present a state-of-mind defense to the charge of first-degree intentional, deliberate, premeditated murder. Also before us is the government's appeal of the district court's grant of a conditional writ of habeas corpus with respect to the sentencing phase.

## STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), a district court shall not grant a habeas petition on a claim that was decided on the merits in state court unless the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or . . . was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

## DISCUSSION

### I. Testimony About Morris's Mental State and Sentence

#### A. Testimony Presented at the Guilt Phase

Prior to trial, the court ordered that Morris be examined to determine his competency to stand trial and whether he could pursue an insanity defense. Dr. Richard Drewery ("Dr. Drewery") and Dr. Richard Pullen ("Dr. Pullen") concluded that Morris was competent and that there was no basis for an insanity defense. During the guilt phase of the trial, Morris's counsel presented testimony from pharmacologist Dr. Robert Parker ("Dr. Parker") and psychiatrist Dr. William Bernet ("Dr. Bernet"). Dr. Parker was an assistant professor of pharmacology at the University of Tennessee. He testified that within ten to fifteen seconds of smoking crack

cocaine, the user experiences euphoria, becomes very excited, speaks rapidly, and sweats profusely. The user also may become suspicious and paranoid, lose inhibition, suffer impaired judgment, and experience enhanced sex drive and performance. The euphoric effects last ten to thirty minutes, while the other effects last longer. Dr. Parker explained that a binge is when a crack user tries to maintain his high by taking more and more crack. The euphoria is replaced by intense anxiety, irritability, fear, suspicion, and paranoia. Binging on crack increases the risk of violent or homicidal behavior. Some crack users experience delusions and hallucinations. Extensive use can cause mania—heightened mental and physical activity—and psychosis—a lost concept of reality. After a user stops ingesting crack, he experiences a crash. A crash is characterized by an intense craving for more cocaine, profound depression, exhaustion, suicidal thoughts, paranoia, anxiety, and irritability.

Dr. Parker testified that Angela Ragland's ("Angela") and Morris's statements to the police regarding Morris's behavior were consistent with crack cocaine ingestion. Angela described Morris as moving around a lot, acting very excited, and sweating. Morris said he was very agitated and upset because he perceived that Charles Ragland ("Ragland") had disrespected him. Dr. Parker testified that it was hard to say whether Morris was under the acute effects of crack or was crashing when he committed the crimes. He said that someone taking crack from Friday at 5:00 p.m. until midnight could still have effects Saturday at 5:20 p.m., when Morris gave his statement. On cross-examination, Dr. Parker testified that a person who has taken crack is not usually violent or homicidal in the crash stage.

Dr. Bernet, the medical director of the University of Vanderbilt's Psychiatric Hospital, took Morris's medical history, examined him, and testified at trial. He also reviewed police reports, interviews, and reports by Drs. Drewery, Pullen, and Parker. Dr. Bernet testified that Morris's life was pretty stable prior to September 1994. Morris was accused of rape and worried that the charge would result in his going to prison and would destroy his relationship with his wife and children. On September 16, 1994, Morris was upset and thought about killing himself by overdosing on cocaine. Physically, he experienced a rush, his heart rate increased, he sweated profusely, and he spoke rapidly. Psychologically, he became highly agitated and paranoid. Morris argued with Ragland and came to believe that Ragland was capable of killing Morris and

his family. Dr. Bernet said that Morris felt threatened by Erica Hurd ("Hurd") and first stabbed her accidentally. He attributed the rest of the stabbings to Morris's agitation and overreaction. Dr. Bernet also noted that Morris behaved irrationally after killing Ragland and Hurd. Morris had Angela bathe him, did not kill her although she could identify him, and went to his home next door and waited for the police. However, Morris also wiped his fingerprints off items in the house. Dr. Bernet testified that Morris's cocaine intoxication may have prevented him from premeditating and forming the specific intent to murder Ragland and Hurd, and that he was under extreme mental and emotional disturbance.

The trial court instructed the jury on first- and second-degree murder. Morris's counsel presented an intoxication defense. The court instructed the jurors that if they found Morris was intoxicated to the extent that he could not have possessed the required culpable mental state, then he could not be guilty of the offense charged. The jury found Morris guilty of two counts of first-degree murder and one count of aggravated rape.

**B. Testimony Presented at the Penalty Phase**

The state called one witness, Dr. O.C. Smith, during the penalty phase. Dr. O.C. Smith, the medical examiner, testified about the nature and extent of Hurd's injuries. Referring to photos and a chart, Dr. O.C. Smith described blunt force injuries to Hurd's head and stab wounds to her face, neck, abdomen, and back. He said the blunt force injuries and most of the stab wounds occurred while Hurd was alive, and the remaining stab wounds were inflicted after she died. Dr. O.C. Smith testified that the stab wounds Hurd received while she was alive would have been painful and described the wounds that hit bone as causing severe pain. He also testified that the nature and location of the stab wounds implied control, targeting, and torment. On cross-examination, Dr. O.C. Smith acknowledged that he could not be certain there were control wounds, that the blunt force to Hurd's head could have rendered her unconscious, and that she would not have felt pain if comatose.

Morris's trial counsel presented six witnesses at the penalty phase. Morris's former employer at a funeral home and cemetery, Mickey Granger ("Granger"), testified that Morris was a good and dependable employee. According to Granger, Morris suffered a "downward slide" in performance after he was accused of rape. Granger testified that Morris was very

concerned that he would lose his wife, and the rape charge was all he talked about. Granger was not aware that Morris used drugs before the rape charge.

Next, Jack Thomas ("Thomas"), Morris's friend from work, testified. When Thomas visited Morris in prison, Morris admitted to Thomas that he killed Ragland and Hurd. According to Thomas, Morris said that he had sex with Angela, but did not rape her. Morris told Thomas that he bought a lot of cocaine on the night of the offenses in an effort to overdose. Morris said he was going to be charged for something he did not do and did not want to live any longer. For about thirty to forty minutes, Morris contemplated killing Angela but he "cam[e] back to his right frame of mind" and decided to let her go.

Three prison employees, Robert Griffin, Anna Campbell, and Brenda Russell, also testified on behalf of Morris. They said that Morris participated actively in classes, helped other inmates, did extra work, and was an excellent student. Finally, Morris's counsel submitted a letter from Frank Brasher ("Brasher"), one of Morris's former employers. According to Brasher, Morris worked for him for about a year and a half in the late 1980s, performed his duties satisfactorily, was prompt, and was courteous.

Ultimately, the jury imposed a death sentence for the murder of Hurd and life without parole for Ragland's murder.

## C. Post-Conviction Testimony

After Morris's conviction and sentence, he filed a post-conviction petition in state court. At the evidentiary hearing, Morris's post-conviction counsel presented witnesses, including the testimony of: (1) his former employer, Granger; (2) his brother, Russell Morris; (3) his three trial counsel, George Googe ("Googe"), Daniel Taylor ("Taylor"), and Jesse Ford, III ("Ford"); (4) his mitigation investigator, Gloria Shettles ("Shettles"); (5) mental health experts, Dr. Pamela Auble ("Dr. Auble"), Dr. Murray Smith ("Dr. Smith"), and Dr. George Woods ("Dr. Woods"); and (6) affidavits by friends and relatives.

Granger testified that Morris could dig more graves in a day than other workers and preferred to work alone. He said that Morris had mood swings and was easily offended if he thought someone was ignoring or disrespecting him. Morris talked to Granger about problems

with his role in society. Granger believed Morris had good relationships with his brother and father, but a poor relationship with his mother. He found indications that Morris drank and smoked crack on the job. Granger said that Morris called him shortly before he was arrested to say that he would not be coming to work because of an injury to his finger. Morris did not mention the killings.

Morris's brother, Russell Morris, testified that their father's girlfriend lived with the family for a time. According to Russell Morris, their mother had mood swings and was hardest on Morris because he would not walk away when she and he argued. She kicked Morris out of the house several times. Russell Morris testified that Morris complained about society to him and got upset when people ignored him. Russell Morris acknowledged that Morris drank alcohol and used drugs, and that their mother drank.

Googe testified that Morris's case was the first death penalty case he tried. Googe reviewed a defenders' death-penalty manual and attended seminars on capital litigation. He had worked with co-counsel Taylor on at least four other murder cases.

Googe found Morris to be a good client and very cooperative. He was very talkative and sometimes volatile. Morris told him he did not want his family contacted, and neither Googe nor Taylor contacted Morris's relatives when they had the opportunity. Googe said Morris's childhood was unremarkable, and that school records were not helpful.

Googe's defense theory was that Morris had diminished capacity because he took crack cocaine and tried to overdose. Googe contacted Dr. Parker to testify about the effects of cocaine generally, both at the suppression hearing about Morris's statement to the police and in the guilt phase. Shettles, the mitigation investigator, told Googe and Taylor that she thought Morris possibly needed a doctor's care for a mental disorder, that he had severe mood swings, was easily excited, may have experienced a drug-induced psychosis, "had a screw loose" and may have been manic depressive. She recommended consulting a neuropsychologist. Googe acknowledged that Shettles told him her concerns about Morris but did not think that Morris was losing control.

The subject of cocaine's effect on Morris was left to Dr. Bernet, a psychiatrist. Googe wanted Dr. Bernet to testify about Morris's cocaine withdrawal and how it disturbed his ability to form the intent to commit murder. Googe provided Dr. Bernet with the criminal complaint against Morris, the police department's incident report, an interview with Angela, Morris's statement to the police, and Morris's interviews with Drs. Drewery and Pullen, who had examined Morris for competency and sanity. Googe acknowledged that law enforcement officers were present when Dr. Drewery examined Morris and that Morris was in handcuffs and agitated. When asked about Morris's comments to Dr. Drewery that Morris was unable to make decisions properly and did not have total control of his mind, Googe said that the defense team used this as part of its strategy to portray Morris's acts as things he would not have done ordinarily. Based on Dr. Bernet's evaluation, Googe did not think Morris had a mental illness. Googe also testified that he did not consider Dr. Drewery's findings helpful as mitigation evidence. According to Googe, there was nothing in the experts' reports that would have led him to investigate bipolar disorder.

Googe testified that Taylor told an investigator to ask Morris's wife if he had mental problems. Morris's wife told Googe and Taylor that Morris had a mental disorder, severe mood swings, a very bad temper, and was easily excited. Googe said that Morris became agitated about certain issues, but Morris did not agree with mitigation investigator Shettles that he was losing control. Googe was not aware that Morris had mood swings on the job. Googe was questioned about Shettles's recommendation that Morris be examined by a neuropsychologist and her belief that Morris was possibly manic depressive. There was also a note from Googe to Shettles saying that they "may not need a psychologist." Googe did not know if Shettles's concerns about Morris's mental health were relayed to Dr. Bernet. He did not know why Dr. Bernet did not get investigative notes about Morris. When asked whether Morris had received head injuries, Googe said Morris had mentioned a car accident but did not say it was a problem. A note Googe wrote indicated that Morris was in a car wreck and had suffered two gun-shot wounds and a head injury. Googe was shown a note from Taylor, which indicated that Morris was in five major car accidents and had a lump on his head.

Googe also testified that Dr. Bernet interviewed Morris and repeated that Morris did not want his wife involved in the case. Morris's wife told Googe that Morris had mood swings after using drugs. Googe stated that nothing in Dr. Drewery's report suggested that Morris was bipolar or had a mental illness. Googe relied on Dr. Bernet's evaluation of Morris, and although lay people had suggested Morris seemed manic depressive, Dr. Bernet did not think so. Based upon the experts who evaluated Morris, Googe saw no reason to pursue the issue of whether Morris was bipolar.

Taylor, Googe's co-counsel, worked as an assistant public defender with Googe beginning in July 1993. Morris's case was Taylor's twenty-fifth trial and his first death-penalty case. He reviewed a Tennessee public defenders' death-penalty manual, attended death-penalty seminars, and met with the head of the public defenders' capital division. Taylor was the defense team's primary contact with Shettles. Shettles was to research Morris's life history, interview potential mitigation witnesses, and assist with jury selection. Taylor described Morris as excited, animated, and very loud but not disrespectful. Morris did not want to talk about the facts of the case.

Taylor was asked about school, prison, and military records. He responded that some of the information about Morris's education was sketchy and that he did not recall anything about Morris's military records. The defense team had two investigators in addition to the mitigation specialist. The investigators conducted interviews and gathered documents about the events leading to Morris's arrest. Before Morris's case, Taylor had not used a psychological expert in a jury trial. He found pharmacologist Dr. Parker through the University of Tennessee. Taylor's notes indicated that Dr. Parker could not be conclusive as to the motion to suppress Morris's statement to the police but would be very helpful during trial. Dr. Parker talked with Morris briefly before trial, but not before the suppression hearing. Taylor also worked with Dr. Bernet, who evaluated Morris's mental health and the effect of drugs on Morris's ability to premeditate. Taylor was concerned about two issues: premeditation and Morris's competency at the time he gave his statement. He reviewed Dr. Drewery's report, prison records, and a letter from Morris's employer.

Taylor asked Shettles to question Morris's wife about any mental problems. Morris's wife said that Morris had a mental disorder and mood swings, was easily excited, and had a very bad temper after he used drugs. Morris did not want defense counsel to contact his family. Taylor denied that Morris lost control, but acknowledged that sometimes their conversations got off track. Through Shettles's investigation, Taylor learned that Morris's grandfather committed suicide and that Morris received an other than honorable discharge from the Army. Shettles recommended that Morris be seen by a neuropsychologist, which prompted Taylor to contact Dr. Bernet. Shettles was concerned about Morris's courtroom demeanor and said that Morris had a screw loose and was possibly manic depressive. Taylor did not recall that Morris had any head injuries.

According to Taylor, the defense's theory was that Morris was under the influence of cocaine and lacked the *mens rea* to commit murder. Taylor said that the defense team hired Dr. Parker to testify about the effects of cocaine for the suppression hearing and as related to Morris's ability to premeditate. With regard to mitigation, Taylor said they presented six witnesses, and the jury also heard from Drs. Parker and Bernet in the guilt phase. Taylor said he did not mention manic depression or head injuries to Dr. Bernet, but recalled expressing his concern about Morris's demeanor. Dr. Bernet examined Morris in March 1996, before Shettles voiced her concerns. Taylor said he relied on the evaluations of Drs. Parker and Bernet.

Ford, the third member of the defense team, entered the case in September 1996 as a consultant on trial strategy. Morris's trial was Ford's first death-penalty case. Ford unsuccessfully sought a plea deal for Morris. Although he had no direct contact either with Dr. Parker or with Dr. Bernet, Ford testified that the defense team did not think they needed another mental-health evaluation after receiving their evaluations. Ford testified that if he had had doubt about Morris's mental status, he would have had Morris examined. He stated that he did not discuss a need for further mental-health examinations of Morris because of what Dr. Bernet said.

Shettles, the mitigation specialist, began working on Morris's case in February 1996. She had attended death-penalty seminars and had a limited role in previous death-penalty cases. With regard to Morris's case, she said she was not proactive and did not know it was the attorneys' first death-penalty case. She identified weaknesses in the mitigation investigation in

Morris's case: the attorneys did not have his birth or pediatric records, they had only minimal school records, they did not follow up to identify his teachers, and they did not obtain his military records. Shettles said that Morris had a history of taking and dealing drugs, including LSD and PCP. She did not tell Morris's attorneys that they needed more information but would have done so by the time she testified today. She said there was a concern about the cost of the investigation.

After an interview with Morris in February 1996, Shettles wrote in a note that Morris was very verbal, had difficulty focusing, and was losing control. Shettles said there was no follow-up after she learned that Morris's grandfather committed suicide, and she did not follow up on his work history. She thought Morris had some side effects from using cocaine, possibly experienced drug-induced psychosis, and had neuropharmacological issues. Shettles recommended having a neuropharmacologist evaluate Morris and said he may have been manic depressive. She was not asked to contact an expert witness. Shettles interviewed Morris's mother and brother in person and other family members by phone. Shettles did not learn that Morris's mother had thrown him out of the house or that she had mood swings. Shettles said that there should have been additional in-person interviews with Morris's family. She did not meet with defense counsel as a team, did not talk to Dr. Bernet, and did not interview Morris's wife. Shettles assisted with jury selection and attended the trial to keep Morris calm and focused. She described him as agitated, very loud, and unable to control his arms.

Neuropsychologist Dr. Auble met with Morris three times in early 2002. She found that Morris was not malingering and concluded that he had some impairments in memory, motor skills, and mental functioning. Dr. Auble found that Morris's IQ was ninety. He had difficulty inhibiting responses, and she could not tell if it was because of frontal lobe damage or a mood disorder. She said that Morris had suffered blows to the head, was chemically dependent, paranoid, and suspicious. Dr. Auble was not asked to do personality testing, and did not make a formal diagnosis for bipolar disorder. Morris did not receive a CAT scan.

Addiction specialist Dr. Smith also evaluated Morris at post-conviction counsel's request. He reviewed the trial transcripts, Dr. Auble's report, and statements by Morris's family and friends. Morris told Dr. Smith he was falsely accused of rape and his name was in the

newspaper. He was distressed by this because he feared he would lose his wife and family and violate his probation. Morris said that he bought $250 of cocaine, perhaps to kill himself, and ingested it over the course of thirteen hours. Dr. Smith termed this a normal crack binge.

According to Dr. Smith, Morris had a verbal and physical confrontation with Ragland. Morris told Dr. Smith that Ragland threatened him, that he thought Ragland was a crack user and dealer, and that he decided he needed to kill Ragland. Dr. Smith agreed that Morris's behavior after the effects of cocaine should have worn off was irrational. He listed characteristics of Morris that were not necessarily related to his drug use: he was hypomanic, grandiose, insomnious, hypersexual, and easily distracted. Hypomanic behavior is characterized by irritability, hyperactivity, racing thoughts, risk-taking, hypersexuality, and a decreased need for sleep. Dr. Smith suspected Morris suffered from bipolar disorder and brain damage at the time of the crimes, said that Morris experienced a cocaine-induced psychosis, and thought that Morris was under the delusions that killing Ragland made sense and that Angela consented to sex with him. He also found evidence of frontal-lobe dysfunction. Based on his assessment, Dr. Smith believed Dr. Parker erred by attributing Morris's crimes only to intoxication because his symptoms far exceeded the effects of intoxication. Dr. Smith opined that the cocaine, coupled with a pre-existing mental illness, caused Morris to go from hypomania to mania to psychosis. He said that Morris was able to premeditate at the time of the crimes but was delusional.

On cross-examination, Dr. Smith testified that Morris is hypomanic most of the time but was manic when he killed Ragland and Hurd. According to Dr. Smith, Morris displayed hypomanic behavior when Dr. Smith saw him in 2003. He acknowledged that there was no record that Morris was ever hospitalized for mental illness. He said irritability could be accounted for by paranoia, that paranoia can be caused by cocaine, and that paranoia can lead to delusion. Dr. Smith said that Morris would need to see a psychiatrist to be diagnosed as bipolar. He had never seen Morris depressed, did not have evidence of manic or depressive episodes prior to the homicides, and acknowledged that there was no direct evidence that Morris met the criteria for bipolar disorder before the killings. Dr. Smith disagreed with Dr. Bernet that it was the effects of cocaine that caused Morris to commit the crimes.

Neuropsychologist Dr. Woods interviewed Morris in February 2002. He reviewed the testing done by the other mental health experts, affidavits by Morris's friends and family, his school records, and his military records. Dr. Woods diagnosed Morris as having bipolar disorder. He testified that bipolar disorder is characterized by phases of mania and depression, and includes manic, hypomanic, euthymic, and depressive behavior. The criteria for hypomania include problems sleeping, distractibility, racing thoughts, and rapid, pressured speech. Hypomania is the same as mania but without delusions and hallucinations. A person could stay in one stage of bipolar disorder his whole life, and one manic episode could be attributed to bipolar disorder. Someone with hypomania can do good work and appear normal. Dr. Woods found Morris's military records significant because of Morris's short stay in the Army. He noted that several of Morris's family and friends remarked that Morris spoke rapidly and was moody. Some commented that Morris's mother was moody and acted strangely, that Morris's grandfather committed suicide, that Morris's father brought his mistress and her children to live with Morris's family, that Morris used drugs, and that Morris's son had periods of depression and agitation.

Dr. Woods commented that Dr. Bernet did not have Morris's social history because he did not talk to Shettles and focused on the crime rather than an overall view of Morris's mental health. He stated that the documents Dr. Bernet reviewed would not have given him insight into Morris's bipolar disorder and that bipolar symptoms could be missed in a two-and-one-half hour interview. Dr. Woods described Morris's behavior as acting on a plan in service of the delusion that Ragland needed to die. He said that Morris's head injuries could have impaired his functioning, that he experienced an interplay of drugs and mental illness, and that cocaine amplified his psychotic state. Dr. Woods agreed that Morris was able to premeditate, understood the consequences of rape, and had never been treated for bipolar disorder. From a review of Dr. Bernet's notes, Dr. Woods found that Dr. Bernet considered, but did not diagnose, bipolar disorder. Dr. Woods acknowledged that Morris was not being treated for bipolar disorder in prison.

Morris's post-conviction counsel also submitted affidavits by Morris's friend Greg Longmeyer, his aunt Flossie Mayes, his nephew David Morris, Donna Marie Owens (the sister

of his first child's mother), his stepson James Kevin Stevens, and Anita Louise Owens Stewart, the mother of his first child. These witnesses stated that: Morris spoke quickly and profusely; his mother was moody and behaved strangely; Morris took drugs and was moody; and Morris's behavior resembled that of his mother. Stewart, who had worked in a mental hospital, thought that Morris's mother was bipolar.

Neuropsychologist Dr. James Walker ("Dr. Walker") testified for the state. He reviewed the evaluations by the other mental-health experts as well as Morris's and Angela's statements and the affidavits submitted by Morris's friends and family. Dr. Walker met with Morris four times and administered psychological tests. He found that Morris did not have obsessions or delusions, that Morris's thinking was logical, and that his intelligence was low-average.

Morris told Dr. Walker that he was the victim of social injustice most of his life. Dr. Walker said that Morris's thinking was logical. He was defensive on the personality-assessment inventory, mistrustful, and egocentric. He had conflicts with authority and was cynical. Morris denied ever having hallucinations, including on the night of the crimes. He told Dr. Walker that he had been shot and hit in the head but never lost consciousness. He took no medications and had not received psychiatric treatment. Morris admitted taking PCP and LSD and drinking up to twelve beers a day. Dr. Walker learned from other sources that Morris had abused amphetamines. Morris was arrested many times in St. Louis for selling drugs, and moved to Jackson, Tennessee to get away from that lifestyle. He worked nine or ten years as a grave digger. Morris was arrested for assaulting a man and waving a shotgun at a woman. At the time of the crimes, Morris lived with his wife, children, and step-children. He engaged in multiple extramarital affairs. According to a prison evaluation that Dr. Walker reviewed, Morris had performed poorly in school, had trouble with thinking, had a constricted affect, was defensive, rigid, complained constantly, and was potentially paranoid and anti-social.

The account of the crimes Morris gave to Dr. Walker differed from his statement to the police. Morris told Dr. Walker that he smoked $500 of crack in twelve hours and drank twenty-four beers and some liquor. He said he was very upset and used cocaine for the first time in order to take his life. Morris told Dr. Walker that Ragland threatened him and his wife with harm. He was angry at the disrespect and determined to take Ragland's life. He entered the

house, got Ragland to apologize, and shot him. Morris planned to leave but noticed Hurd behind him. Morris told Dr. Walker that he hit Hurd with a gun, and that Hurd must have fallen on a knife. Morris said the police fabricated the evidence that he stabbed Hurd thirty-seven times. He said cocaine made him paranoid and nervous. Dr. Walker concluded that Morris was intoxicated on cocaine and alcohol on the night of the crimes and that intoxication was a very powerful factor affecting his behavior. Morris's problems with thinking and reasoning also played a role. Dr. Walker diagnosed Morris as being paranoid and anti-social with a history of hypomania. He placed Morris in the Bipolar II category. Dr. Walker said there is a range of bipolar disorders—all of which involve difficulty in regulating mood—with Bipolar I being more severe than Bipolar II. Dr. Walker found that Morris did not experience cocaine-induced psychosis.

## II.    Guilt Phase

On appeal, Morris argues that the district court erred when it determined that trial counsel's ineffective assistance did not prejudice him in the guilt phase of trial because the court ignored the impact of his psychiatric and cognitive impairments on his capacity to act with the state of mind necessary for first-degree murder. We disagree.

### A. Background

In his post-conviction petition, Morris alleged that his trial counsel failed to investigate and present evidence of his background and mental impairments that would have shown him incapable of the *mens rea* required for first-degree murder. The Tennessee trial court held an evidentiary hearing and denied Morris relief. The trial court found that Morris's counsel conducted a thorough and proper investigation and adequately prepared for trial. Counsel had no reason to believe that Morris had a mental or physical disease, defect, or condition that would have supported an insanity defense, prevented him from having culpable intent, or mitigated the crimes. Morris had never been treated for mental illness and had lived a reasonably normal life. Counsel had every reason to believe that Dr. Bernet would have recommended an evaluation by a neuropsychologist or neuropsychiatrist if doing so would have aided in the defense. Accordingly, the trial court concluded that counsel made an informed decision to pursue the theory that Morris was unable to form the intent to commit the crimes charged because of pre-existing mental-health problems exacerbated by the use of a large amount of cocaine, and

counsel reasonably relied upon lay proof of Morris's abnormal behavior and expert proof by Drs. Parker and Bernet. Ultimately, counsel's strategy was reasonable, and the opinions of Morris's post-conviction experts were contradicted by the facts of the case that showed motive, intent, deliberation, premeditation, and mental competence.

The Tennessee appellate court adopted the trial court's findings and affirmed the decision to deny Morris's claim. The court quoted and cited *Strickland v. Washington*, 466 U.S. 668 (1984), for the elements of an ineffective assistance of counsel claim. *Morris*, 2006 WL 2872870, at *44, *62. Morris's guilt- and penalty-phase ineffective-assistance-of-counsel claims relied on similar allegations, and the state court addressed both claims in the section of the opinion devoted to Morris's guilt-phase claims. The court reasoned that it "cannot conclude that had Dr. Bernet been in possession of [additional] information that he would have made the same diagnosis as Dr. Woods and/or the impact of such a diagnosis would have such effect upon the jury as to alter the outcome." *Id.* at *54. After reviewing the information known by counsel and the trial testimony, the court held that Morris's trial counsel could not "be faulted for failing to provide an expert that would have diagnosed the Petitioner with Bipolar Disorder." *Id.* The court noted that the jury heard two versions of events: the defense's theory that Morris lacked specific intent for premeditation because of his cocaine intoxication and mental impairments and the government's theory that Morris planned to get back at his neighbor and acted deliberately. *Id.* at *51-54.

The federal district court reviewed the decision of the Tennessee Court of Criminal Appeals *de novo* out of concern that the state court had misapplied *Strickland* and considered evidence Morris submitted to the district court. *Morris v. Bell*, No. 07-1084-JDB, 2011 WL 7758570, at *25 (W.D. Tenn. Sept. 29, 2011) (order).

The district court found that the state court recited both parts of the *Strickland* standard correctly, but omitted the phrase "reasonable probability" when analyzing whether Morris had shown prejudice from his counsel's performance. *Id.* at *22-23. The district court held that Morris's trial counsel's performance in the guilt phase was deficient because they failed to investigate and obtain an appropriate social history, failed to supply such information to their expert witnesses, and failed to determine whether they needed other experts. *Id.* at *27.

However, the court held that Morris did not establish prejudice because his actions demonstrated that he had the *mens rea* to be convicted of first-degree murder. *Id.* Accordingly, there was not a reasonable probability that the verdict would have been different with the additional information. *Id.*

**B. *Strickland* Analysis**

To prevail on a claim of ineffective assistance, Morris must show both that his counsel's performance was deficient and that the deficient performance prejudiced his defense. *Strickland*, 466 U.S. at 687. Counsel's performance is deficient if it falls below an objective standard of reasonableness. *Abby v. Howe*, 742 F.3d 221, 226 (6th Cir. 2014). Counsel's performance prejudices a defendant in the guilt phase if "there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Hinton v. Alabama*, 134 S. Ct. 1081, 1089 (2014) (quoting *Strickland*, 466 U.S. at 695).

"The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington v. Richter*, 562 U.S. 86, 105 (2011). Where review is under *Strickland* and AEDPA, a federal court's review of a state court's decision on a claim of ineffective assistance of counsel is "doubly deferential." *Burt v. Titlow*, 134 S. Ct. 10, 13 (2013) (quoting *Cullen v. Pinholster*, 131 S. Ct. 1388, 1403 (2011)). If the state court's decision is contrary to federal law, this court reviews the petitioner's claim *de novo*. *See Dyer v. Bowlen*, 465 F.3d 280, 284 (6th Cir. 2006).

The conclusion of the Tennessee Court of Criminal Appeals that Morris's counsel's performance was not deficient was not an unreasonable application of *Strickland* because counsel satisfied *Strickland*'s deferential standard. *See Harrington*, 562 U.S. at 105. By adopting the trial court's findings, the Tennessee Court of Criminal Appeals held that Morris's counsel's performance was not deficient because their investigation and preparation were thorough, and that counsel had no reason to believe that Morris was suffering from a mental condition that would have prevented him from forming the requisite intent. *Morris*, 2006 WL 2872870, at *54. Accordingly, AEDPA deference applies to this aspect of Morris's claim.

Morris's counsel satisfied *Strickland*'s standard.  *See Harrington*, 562 U.S. at 105. Counsel's strategy was to convince the jury that Morris lacked the *mens rea* to commit first-degree murder because of the effects of cocaine and mental stress.  They declined to pursue an insanity defense after the court-appointed experts concluded that Morris was competent to stand trial and sane at the time of the crimes.  Counsel retained two qualified experts, a pharmacologist and a psychiatrist, to testify about the effects of cocaine generally and the effects on Morris on the night in question.  Dr. Parker testified that Morris's actions and mental state, including paranoia and delusions, were consistent with his account of binging on crack.  Dr. Bernet stated that Morris's cocaine intoxication may have left him incapable of premeditating and forming the intent to murder Hurd.  Although the testimony of Drs. Parker and Bernet did not persuade the jurors, it supported counsel's theory that Morris lacked the requisite *mens rea*.  Attorneys are entitled to rely on the opinions and conclusions of mental-health experts.  *See McGuire v. Warden, Chillicothe Corr. Inst.*, 738 F.3d 741, 758 (6th Cir. 2013); *Black v. Bell*, 664 F.3d 81, 104-05 (6th Cir. 2011).  None of Drs. Drewery, Pullen, and Bernet indicated that Morris suffered from bipolar disorder or any other mental illness.  Given the evidence against Morris and the unavailability of a plea deal or an insanity defense, Morris's counsel reasonably chose to rely on their experts and argue that he lacked the *mens rea* for first-degree murder of Hurd.

Morris's post-conviction evidence demonstrated that lay people who had contact with him suspected he had mental problems, and Drs. Auble, Smith, and Woods identified mental impairments and disorders.  Drs. Woods, Smith, and Walker diagnosed Morris as bipolar, and Dr. Woods said that Dr. Bernet lacked the background information to diagnose Morris.  Since Morris did not call Drs. Drewery, Pullen, or Bernet as witnesses in the post-conviction evidentiary hearing, there is no evidence that the doctors wanted more information about Morris's background or that Morris refused to cooperate.  As the district court found, there were red flags that could have led Morris's counsel to investigate further.  *See Wiggins v. Smith*, 539 U.S. 510, 527 (2003); *Hodges v. Colson*, 727 F.3d 517, 542 (6th Cir. 2013).  The mitigation investigator expressed concern about Morris's mental health and passed on Morris's wife's comments.  Had counsel passed on more information to Dr. Bernet, he may have discovered more of Morris's problems.  But neither counsel nor Dr. Bernet believed Morris was mentally ill. However, in light of counsel's reasonable efforts to put together a plausible defense based on

cocaine intoxication, their failure to be more aggressive in pursuing evidence of free-standing mental illness does not, by itself, render their performance constitutionally deficient.

Giving proper deference to the state court's decision and counsel's judgment, Morris has not shown that the state court's decision was unreasonable. *See Burt*, 134 S. Ct. at 13; *Pinholster*, 131 S. Ct. at 1403; *Abby*, 742 F.3d at 226; *Williams v. Anderson*, 460 F.3d 789, 800 (6th Cir. 2006). Accordingly, because counsel's performance was not constitutionally deficient, we need not address the prejudice prong of the *Strickland* analysis.

### III.    Sentencing Phase

The district court granted habeas relief on Morris's claim of ineffective assistance of counsel in the sentencing phase, and the government cross appeals. On appeal, the government argues that the district court erred because the state court reasonably determined that Morris failed to establish a diagnosable illness and that counsel consulted with three mental-health experts who strategically chose not to rely on that theory. We agree.

### A. Background

In post-conviction proceedings, Morris argued that counsel failed to investigate his mental illness and failed to properly use a mitigation specialist. According to Morris, counsel should have had him examined by mental-health experts to determine the existence of a brain injury or mental impairment. Counsel also should have brought out his childhood poverty, neglect, abuse, and exposure to violence, drugs, and alcohol. Finally, Morris argued that counsel failed to provide Drs. Bernet or Parker with pertinent information and failed to present expert or lay mitigation testimony.

The Tennessee Court of Criminal Appeals noted that the claim was intertwined with Morris's guilt-phase claim and again cited and quoted *Strickland*'s two-part test. *Morris*, 2006 WL 2872870, at *60-62. The appellate court adopted the trial court's finding on performance that Morris's counsel conducted a thorough and proper investigation and had no reason to believe Morris was suffering from a mental disease, defect, or condition that would have mitigated his crimes. *Id.* at *64. The court also concluded that counsel was entitled to rely on Dr. Bernet's judgment about whether an evaluation by a neuropsychiatrist or

neuropsychologist was needed. *Id.* at \*56. Turning to prejudice, the court stated that: "A defendant must demonstrate 'a reasonable probability that, but for counsel's [unprofessional] errors, the result of the proceeding would have been different.' The Petitioner has failed to meet this standard." *Id*. at \*62 (quoting *Strickland*, 466 U.S. at 694). Considering the aggravating circumstances, the Tennessee Court of Criminal Appeals noted that "we cannot conclude that had expert testimony that the Petitioner suffered from Bipolar Disorder II been presented to the jury that a sentence other than death would have been imposed." *Id.* at \*54. The court recognized that the additional mitigation evidence Morris presented in post-conviction proceedings was double-edged because it showed both a history of personality problems in Morris and his family and a history of drug abuse and illegal activity. *Id*. at \*61-62.

The federal district court reviewed Morris's claim *de novo* out of concern that the state court improperly applied *Strickland*'s prejudice prong. *Morris*, 2011 WL 7758570 at \*25. The district court found that there was substantial information that should have caused counsel to investigate further whether Morris was mentally ill and how cocaine and alcohol affected his cognitive abilities. *Id.* at \*28. It noted that the mitigation specialist's investigation was limited, that Dr. Bernet's testimony was not used in mitigation, and that there was no mitigation proof about Morris's background, family history, brain damage or mental illness. *Id.* Accordingly, the district court found that there was a reasonable probability that one juror would have voted against the death penalty had Morris's counsel presented the available mitigation evidence. *Id.*

## B. *Strickland* Analysis

"An attorney's failure to reasonably investigate the defendant's background and present mitigating evidence to the jury at sentencing can constitute ineffective assistance of counsel." *Goodwin v. Johnson*, 632 F.3d 301, 318 (6th Cir. 2011) (citing *Wiggins*, 539 U.S. at 521-22). To assess the reasonableness of counsel's performance, "[t]he court must consider not only the evidence known to counsel, but also whether that evidence 'would lead a reasonable attorney to investigate further.'" *Hodges*, 727 F.3d at 542 (quoting *Wiggins*, 539 U.S. at 527). "[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on the investigation." *Wiggins*, 539 U.S. at 528 (quoting *Strickland*, 466 U.S. at 690-91). Courts should not second-guess

counsel's strategic decisions, and should presume that counsel's conduct is reasonable. *Strickland*, 466 U.S. at 689; *Jackson v. Bradshaw*, 681 F.3d 753, 760 (6th Cir. 2012). "The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington*, 562 U.S. at 105.

To assess the potential prejudice to a defendant at sentencing, the court must reweigh the evidence in aggravation against the total available mitigating evidence adduced at trial and in post-conviction proceedings, *see Wiggins*, 539 U.S. at 534, to determine "whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695; *see also Porter v. McCollum*, 558 U.S. 30, 39-40 (2009); *Wong v. Belmontes*, 558 U.S. 15, 19-20 (2009). The petitioner must present new evidence that differs both in strength and subject matter from the evidence actually presented at sentencing, not just cumulative mitigation evidence. *Jackson*, 681 F.3d at 770; *Phillips v. Bradshaw*, 607 F.3d 199, 216 (6th Cir. 2010).

As a threshold matter, Morris argues on appeal that the Supreme Court's decisions in *Martinez v. Ryan*, 132 S. Ct. 1309 (2012), and *Trevino v. Thaler*, 133 S. Ct. 1911 (2013), allow him to rely on evidence he produced in the district court. In *Martinez,* the Court held that ineffective assistance or absence of collateral counsel may constitute cause to excuse the procedural default of an ineffective-assistance-of-trial-counsel claim. 132 S. Ct. at 1320.[1]

However, *Martinez* and *Trevino* do not apply to Morris's case because he did not procedurally default his ineffective-assistance-of-trial-counsel claims. Morris presented his ineffective assistance of trial counsel claims in state post-conviction proceedings. The Tennessee Court of Criminal Appeals denied them on the merits. *Morris*, 2006 WL 2872870, at *54, *62. *Martinez* does not apply to claims that were fully adjudicated on the merits in state court because those claims are, by definition, not procedurally defaulted. *Detrich v. Ryan*, 740 F.3d 1237, 1246 (9th Cir. 2013).

---

[1]*Martinez* and *Trevino* apply to cases in Tennessee. *Sutton v. Carpenter*, 745 F.3d 787, 795-96 (6th Cir. 2014).

The decision of the Tennessee Court of Criminal Appeals to deny Morris's claim was not an unreasonable application of *Strickland*. Morris's counsel's strategy was to make the case that Morris would not have committed the crimes if he had not been intoxicated and that he was basically a good person who would function well in prison. Counsel hired experts in pharmacology and psychology, investigators, and a mitigation specialist. The defense team investigated Morris's background, to an extent, and relied on mental-health experts' opinions to form their strategy. To the extent that Morris failed to provide defense counsel and the mental-health experts with background information, counsel cannot be blamed. *See Fautenberry v. Mitchell*, 515 F.3d 614, 625 (6th Cir. 2008); *Hicks v. Collins*, 384 F.3d 204, 215 (6th Cir. 2004). Based upon the experts' findings, counsel presented testimony in the guilt phase to show how cocaine intoxication and withdrawal can affect the user's ability to reason and that Morris may have been unable to form the intent to commit murder. They did not present new expert testimony at sentencing, but the experts' testimony was already before the jury. In closing arguments, Morris's counsel attempted to connect the guilt- and penalty-phase evidence. Morris's counsel were entitled to rely upon the assessments performed by mental-health experts in forming their strategy. Mitigation witnesses testified about Morris's character, work habits, and good behavior in prison. *See McGuire*, 738 F.3d at 758; *Black*, 664 F.3d at 104-05. There is a reasonable argument that counsel satisfied *Strickland*'s deferential standard. *See Harrington*, 562 U.S. at 105.

By not presenting additional mental-health testimony in the mitigation phase, counsel avoided opening the door to rebuttal evidence of Morris's history of drug dealing, drug use, and other illegal acts. *See Wong*, 558 U.S. at 25-27 (finding that introduction of additional mitigation evidence could have invited rebuttal evidence that petitioner was responsible for a second murder); *Bell v. Cone*, 535 U.S. 685, 700 (2002) (noting counsel's fear that calling witnesses from petitioner's childhood or time in the Army could have led to prosecutor's introducing evidence about respondent's criminal history); *Sutton v. Bell*, 645 F.3d 752, 763-64 (6th Cir. 2011) (holding that state court reasonably considered the possibility that presenting evidence of petitioner's troubled background could have opened the door to rebuttal evidence of his prior drug use and violent acts). Under Tennessee law, the prosecution may introduce evidence to rebut a mitigating factor raised by the defendant. *Carter v. Bell*, 218 F.3d 581, 598-600 (6th Cir.

2000); *Cozzolino v. State*, 584 S.W.2d 765, 768 (Tenn. 1979). This court may entertain possible reasons for counsel's decisions even if not expressed by counsel. *See Pinholster*, 131 S. Ct. at 1407. Accordingly, the risk of rebuttal evidence is a valid consideration whether or not Morris's counsel considered it.

The Supreme Court and this court have denied habeas relief on similar claims. *See Pinholster*, 131 S. Ct. at 1405-06 (concluding that state court's denial of deficient-performance claim was not unreasonable because counsel consulted a psychiatrist who found no brain damage, petitioner bragged about his criminal activities, and counsel reasonably chose to rely on seeking sympathy for petitioner's mother); *Bell*, 535 U.S. at 698-02 (finding Tennessee Court of Criminal Appeals's denial of ineffective-assistance-of-counsel claim not an unreasonable application of *Strickland* because, even though trial counsel offered no mitigation evidence at the penalty phase, counsel called jury's attention to guilt-phase evidence that was presented to support insanity defense); *Black*, 664 F.3d at 104-05 (holding that petitioner who alleged that counsel should have hired a psychiatrist who would have diagnosed him with brain damage did not show ineffective assistance of counsel because counsel had him evaluated by mental-health experts and had no reason to believe that further investigation would have produced mitigation evidence); *Carter v. Mitchell*, 443 F.3d 517, 526-30 (6th Cir. 2006) (finding no ineffective assistance of counsel at mitigation because counsel used a qualified psychologist and post-conviction evidence did not establish that trial counsel missed probative mental-health evidence).

Here, the conclusion of the Tennessee Court of Criminal Appeals that Morris's counsel's performance was not deficient was not contrary to or an unreasonable application of federal law. *See* 28 U.S.C. § 2254(d); *Berghuis v. Thompkins*, 560 U.S. 370, 378 (2010). Accordingly, because counsel's performance was not constitutionally deficient, we need not address the prejudice prong of the *Strickland* analysis.

**AFFIRMED in part and VACATED in part, and this case is REMANDED to the district court for a denial of the writ in accordance with this decision.**