RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 21a0172p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

JON HALL,

> *Petitioner-Appellant,*

*v.*

TONY MAYS, Warden,

> *Respondent-Appellee.*

Nos. 10-5658/15-5436

Appeal from the United States District Court
for the Western District of Tennessee at Jackson.
No. 1:05-cv-01199—J. Daniel Breen, District Judge.

Argued: January 30, 2019

Decided and Filed: August 3, 2021

Before: BATCHELDER, CLAY, and GRIFFIN, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Kelley J. Henry, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Nashville, Tennessee, for Appellant. John H. Bledsoe, OFFICE OF THE TENNESSEE ATTORNEY GENERAL, Nashville, Tennessee, for Appellee. **ON BRIEF:** Paul R. Bottei, Kristen M. Stanley, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Nashville, Tennessee, for Appellant. John H. Bledsoe, OFFICE OF THE TENNESSEE ATTORNEY GENERAL, Nashville, Tennessee, for Appellee.

_____

## OPINION

_____

ALICE M. BATCHELDER, Circuit Judge. Jon Hall, a Tennessee death row inmate, has appealed the district court's denial of his petition for a writ of habeas corpus, filed under

28 U.S.C. § 2254. In this appeal, Hall sought and we granted a certificate of appealability ("COA") on claims that: (1) the state prosecutor withheld exculpatory evidence of a state witness's mental illness; (2) Hall's trial counsel was ineffective for failing to challenge Hall's competency to stand trial; and (3) Hall's trial counsel was ineffective for failing to present certain family- and social-history evidence. Finding that Hall cannot prevail on any of these claims, we AFFIRM.

## I.

In July 1994, Hall murdered his estranged wife, Billie Jo, by attacking her in her home, dragging her to the backyard swimming pool while at least one of her children looked on, and drowning her there. In February 1997, a jury in a Tennessee state trial court convicted Hall of premeditated first-degree murder and sentenced him to death, finding that the murder was especially heinous, atrocious, or cruel, and involved torture or serious physical abuse beyond that necessary to cause death. *See* T.C.A. § 39-13-204(i)(5). The Tennessee Court of Criminal Appeals and the Tennessee Supreme Court affirmed the conviction and sentence. *Tennessee v. Hall*, No. 02C01-9703-CC-00095, 1998 WL 208051 (Tenn. Crim. App., Apr. 29, 1998); *Tennessee v. Hall*, 8 S.W.3d 593 (Tenn. 1999). The Tennessee Supreme Court recounted the facts as follows:

> When she met [Hall], Billie Jo [] had two daughters . . . from a former relationship. After their marriage, she and [Hall] had two more daughters. . . . The youngest [] suffered from cerebral palsy. At the time of her murder, [Billie Jo] and [Hall] were estranged and living separately.
>
> On the night of July 29, 1994, [Hall] went to [Billie Jo]'s house to discuss a reconciliation. He brought a $25.00 money order made out to [Billie Jo] as a payment toward child support. Prior to entering the house, [Hall] disconnected the telephone line at the utility box on the outside wall of the house. When [Billie Jo] answered the door, [Hall] pushed his way into the room where she and the children were watching television. [Hall] told the girls to go to bed. When they did not immediately obey his order, [Hall] tipped over the chair in which [Billie Jo] was sitting. [Hall] and [Billie Jo] then went back into her bedroom. The children, who had gone into their bedrooms, could hear things slamming around and [Hall and Billie Jo] yelling at each another. When the children tried to enter the room, they found the door blocked. The three oldest children [] persisted in their efforts to get into the room and finally succeeded. They attempted to stop [Hall] from hurting their mother. When [Billie Jo] told the children to go to a

neighbor's house, [Hall] told them that if they went for help, 'he was going to kill Mama.' He also told [Billie Jo], a college student, that she would never live to graduate. [Two of the daughters] tried to use the telephone to call for help, but they discovered the telephones would not work. At that point, they went to a neighbor's house where they called 911. [T]he oldest child[] was the last to leave [Billie Jo's] house, [and was] carrying her [youngest] sister []. Before she left, she saw her mother and [Hall] leave the bedroom and go outside. She watched [Hall] drag her mother, 'kicking and screaming,' to the small pool in the back yard.

The first officer to arrive on the scene . . . was directed by a neighbor to check the pool where he found [Billie Jo]'s body floating face down in the water. He immediately called Emergency Medical Services and [the] Tennessee Bureau of Investigation. . . . [A TBI agent] arrived on the scene shortly after midnight.

[The TBI Agent] entered the house and found the master bedroom in disarray. Bloodstains marked the bed, a counter top, and a wedding dress. The telephones inside the house were off their hooks. A $25.00 money order made out to [Billie Jo] and dated the day of the murder was found inside the house. No weapons were found. A trail of drag marks and bloodstains led from the master bedroom, out the front door, over the driveway, past the sandbox, and down to the pool in the back yard. [Billie Jo]'s t-shirt was lying beside the pool. Clumps of grass ripped from the ground floated in the blood-tinged water of the pool. Outside the front door of the house the telephone junction box was opened and the phone line was disconnected. The grass and weeds near this box were matted down.

[T]he forensic pathologist who performed the autopsy on [Billie Jo] testified that the primary cause of death was asphyxia resulting from a combination of manual strangulation and drowning. He could not say with certainty that either strangulation or drowning was the exclusive cause of death. Evidence supporting strangling as a contributing cause of death included bruising on the left and right sides of [Billie Jo]'s neck, hemorrhaging in the neck muscles around the hyoid bone in the neck, and bleeding in the thyroid gland, which indicated that extensive compression had been applied to the neck. Evidence supporting drowning as a contributing cause of death was water found in both [Billie Jo]'s stomach and in her bloodstream. The water in her stomach could have collected when [Billie Jo] swallowed water as she was being drowned. The water in her bloodstream would have entered when she took water into her lungs, and the water passed through the lungs into her bloodstream.

Before dying, [Billie Jo] sustained at least eighty-three separate wounds, including several blows to the head, a fractured nose, multiple lacerations, and bruises and abrasions to the chest, abdomen, genitals, arms, legs and back. Abrasions on [Billie Jo]'s back were consistent with having been dragged across pavement. [The forensic pathologist] used a mannequin during his testimony to demonstrate the size and location of the various wounds on [Billie Jo]'s body. . . .

He described some of the injuries to [Billie Jo]'s arms, legs and hands as defensive wounds. He characterized the injuries to the neck, face and head as intentional 'target' wounds. Except for the physical trauma associated with the strangulation, however, none of the injuries would have proven fatal.

Chris Dutton, who was confined in a cell next to [Hall], testified that while both men were incarcerated, [Hall] confided in him about [Billie Jo]'s murder. When describing what happened on the night of the murder, [Hall] told Dutton that he had tried to talk with [Billie Jo] about reconciling but 'all she was interested in was the money.' When she refused to consider his plea for reconciliation and demanded that he leave, 'his temper got the best of him and he began to strike her.' According to Dutton, [Hall] had determined, even before he arrived at [Billie Jo]'s house, 'to make her . . . suffer as he did, feel the helplessness that he was feeling because she took his world away from him.' [Hall] told Dutton that he hit [Billie Jo] in the head until he panicked, threw her in the swimming pool, then re-entered the house, took the car keys, and drove away in [Billie Jo]'s minivan.

On cross-examination, Dutton admitted that [Hall] also told him that he was depressed and had been drinking since he telephoned [Billie Jo] earlier that day[,] . . . that he was very concerned about the welfare of his two daughters, especially [the youngest with cerebral palsy, and] . . . that he disconnected the telephone line, because, when he and his wife argued in the past, she had called the police.

Two witnesses testified on [Hall]'s behalf during the guilt phase of trial. Dr. Lynn Donna Zager, a clinical psychologist, interviewed [Hall] several times after his arrest[,] diagnosed him as depressed and suffering from alcohol dependence[, and] noted personality characteristics of paranoia and dependency. In Dr. Zager's opinion, at the time of the killing[,] [Hall] suffered from depression and alcohol intoxication. These factors were compounded by his personality characteristics and various psycho-social stressors, including a sick child, loss of employment with the resulting financial problems, his impending divorce, and the terminal illness of a brother. Dr. Zager testified that, in her opinion, [Hall] acted in an impulsive manner in killing his wife, rather than pursuant to a preconceived plan.

On cross-examination, Dr. Zager admitted that she based her opinion concerning [Hall]'s intoxicated state on statements he made to her and statements of other witnesses who saw him drinking on the day of the murder. She agreed that no one she interviewed remarked on whether [Hall] exhibited any of the typical physical signs of intoxication, such as slurred speech or lack of coordination.

[The other defense witness was Hall's boss.] [He] testified [that] . . . , prior to the killing[,] [Hall] had been severely depressed because of his family problems.

[Hall] . . . call[ed] his sister, [S]heryl Arbogast, to testify regarding his state of mind at the time of the murder, but she had no first-hand knowledge of [Hall]'s state of mind on the night of the murder. In fact, [she] admitted she had not spoken to [Hall] for several months prior to the murder. Her testimony regarding [Hall]'s state of mind was based on a conversation she had with her [other] brother[], since deceased, on the day of the murder. The trial court would not permit this hearsay testimony to be admitted before the jury. At the conclusion of the evidence, the jury found [Hall] guilty as charged of first degree premeditated murder.

During the sentencing phase[,] the State recalled [the forensic pathologist] to testify in more detail concerning the extent of [Billie Jo]'s injuries. The State introduced photographs of the injuries taken at the autopsy to illustrate [the forensic pathologist]'s testimony. These photographs depicted the numerous external wounds [Hall] inflicted while struggling with [Billie Jo].

[Hall] called Dr. Zager and Dr. Joe Mount, a psychological examiner who counseled [Hall] at Riverbend Maximum Security Institution. Both described [Hall] as depressed, remorseful, suicidal and extremely concerned about his children. Dr. Mount testified that [Hall] had been diagnosed as suffering from an adjustment disorder with mixed emotional features (anxiety and depression) and substance abuse of dependence by history.

[Hall's boss] also testified again. He described [Hall] as a good, dependable employee and told how [Hall] had cared for his children when he brought them to work with him. [Hall's boss] stated that [Hall] loved his wife and children and had hoped to reconcile with [Billie Jo].

[Hall] also presented his three sisters and his mother to recount the history of [Hall] and his family. [Hall] was the youngest of seven children. His father, an alcoholic, physically and verbally abused his wife until he died from a heart attack in 1974 when [Hall] was ten. [Hall]'s father [had] denied that [Hall] was his son and snubbed [Hall]. The witnesses' descriptions of the fights between [Hall]'s parents eerily paralleled [Hall]'s final confrontation with his own wife. All of [Hall]'s relatives described him as a good father who loved his children.

*Hall*, 8 S.W.3d at 596-99 (editorial marks, certain quotation marks, and footnotes omitted).

Following his unsuccessful direct appeals, Hall actively but unsuccessfully pursued post-conviction relief in the Tennessee state courts, both pro se and with counsel. In July 2005, having exhausted his state-court proceedings, Hall filed a pro se § 2254 petition in federal court, raising 24 claims. After obtaining counsel, he filed an amended, 74-page petition in April 2006, asserting 20 claims, many with multiple sub-claims. A new counsel amended Hall's petition again in June 2007 to add a *Brady* claim about witness Chris Dutton. The district court declined

to hold a hearing and, in April 2010, issued a meticulous 134-page opinion that denied Hall any relief and denied him a COA for any of his claims. We granted an initial COA on two of those claims, which are now before us in this appeal: (1) the *Brady* claim concerning prison records about Chris Dutton's mental illness and (2) an ineffective-assistance-of-counsel (IAC) claim concerning evidence of Hall's family and social history.

In his *Brady* claim, Hall asserted that the prosecutor withheld prison records for state witness Chris Dutton that would have impeached Dutton's testimony by showing his long history of mental illness. The district court recognized that Hall procedurally defaulted this claim by failing to raise it in the Tennessee courts, but analyzed it on the merits anyway because Hall argued that the *Brady* claim itself overcame the procedural default. The district court found that Dutton's prison records were never actually in the prosecutor's possession because they were records of the Tennessee Department of Corrections (TDOC), which was not an agency acting under the prosecutor's control, so the prosecutor did not know about them, actually or constructively. Hall argued that the prosecutor had a duty to investigate, discover, obtain, and disclose the TDOC's records because Dutton was an inmate and a state witness, but the district court disagreed, finding that *Brady* does not impose such an unlimited duty to pursue that type of inquiry with uninvolved government agencies. The district court found that, because Hall had "not allege[d] . . . any connection between the TDOC and the prosecution in the investigation of this case, and none [wa]s apparent from the record," it had "no basis for imputing knowledge of the mental health information in Dutton's TDOC records to the prosecution." It then concluded that the *Brady* claim necessarily failed and Hall could not overcome the procedural default.

In his IAC claim, Hall argued that because his trial counsel "failed to obtain and present evidence from his family and other sources respecting his social history," counsel did not "submit[] a complete social history to Dr. Zager," which Dr. Zager could have used "at the guilt stage to demonstrate that Hall was not capable of forming the intent required for first degree murder and at sentencing to mitigate a sentence of death." Hall raised this claim in his state post-conviction proceedings, but the state courts determined, based on the evidentiary hearing, that Hall failed to prove that his counsel did not provide Dr. Zager with all relevant information:

[Hall] contends that trial counsel w[ere] ineffective for failing to provide Dr. Zager with a complete mitigation history . . . [but] he fails to allege which portions of his social history were not provided. . . . It was established [] that [Hall] had been appointed investigators by the court [but] [Hall] did not present the testimony of these investigators or his pretrial attorneys at the post-conviction hearing.

The mitigation assessments and reports provided [to Hall's attorneys] by Dr. Ann Charvat and Gloria Shettles were introduced as part of the post-conviction record. Dr. Charvat's assessment contained summaries of her interviews with Sheryl Arbogast and [Hall]'s mother[,] . . . a lengthy family history[,] . . . a list of potential witnesses[,] and detailed guidance for the manner in which defense counsel should prepare for a capital murder trial. . . . [Other evidence] show[ed] that both [Hall] and Sheryl Arbogast had reviewed and made corrections to Dr. Charvat's initial assessment . . . [and] that correspondence had been forwarded to [Hall]'s family for the purpose of separate interviews and additional background information. . . . [Hall did not call Shettles to testify at the hearing,] . . . provide the court with additional reports[, or] . . . establish[] that Ms. Shettles did not interview potential witnesses. . . . [C]ounsel was granted funds for a private investigator . . . [but] [t]here is no evidence [as to whether the investigator] did or did not conduct any investigation.

Trial counsel testified [at the hearing] that Dr. Zager was provided all of the relevant information that they possessed. . . . [A] letter [from] Dr. Zager to one of [Hall]'s pretrial attorneys . . . stated her need for more information before she would be able to deliver a definitive assessment of [Hall]. Specifically, she inquired as to interviews with Randy Helms, Jackie and Darlene Brittain, [Hall]'s mother, Debbie Davis, Sheryl Arbogast, and Jeff Hall. The letter closed by stating, 'I will provide a complete report once the above information is received and reviewed in light of the evaluation.' [Hall did not] call Dr. Zager as a witness at the post-conviction hearing [but] [w]e can presume from the fact that she testified as to [Hall]'s mental condition at trial that she was provided sufficient information for a complete report.

[Hall] has failed to establish that Dr. Zager was not provided all relevant information. Counsel cannot be found deficient when they complete an adequate investigation.

*Hall v. Tennessee*, No. W2003-00669-CCA-R3-PD, 2005 WL 22951, at *32-33 (Tenn. Crim. App., Jan. 5, 2005) (quotation marks and citations omitted, certain paragraph breaks omitted and inserted). In analyzing this under § 2254, the district court quoted the above passage and concluded that "[t]he Tennessee Court of Criminal Appeals' decision was neither contrary to nor an unreasonable application of clearly established federal law and was based on a reasonable determination of the facts in light of the evidence presented." The district court added that, while

a more complete social history might have provided more detail, the evidence presented would have been repetitive, so even if counsel were deficient, Hall was not prejudiced.

Hall appealed (No. 10-5658) but moved this court to hold his appeal in abeyance and to remand so that he could pursue claims under *Martinez v. Ryan*, 566 U.S. 1 (2012), and, subsequently, *Trevino v. Thaler*, 569 U.S. 413 (2013). We granted the motion. On remand, the district court painstakingly considered and denied each of Hall's numerous *Martinez-* or *Trevino-*based claims, both new and reasserted, and again denied Hall a COA for any claims. *Hall v. Carpenter*, No. 05-1199, 2015 WL 1464017, at *33 (W.D. Tenn. Mar. 30, 2015). We granted a COA on one of those claims, which is the third claim now before us in this appeal: an IAC claim concerning Hall's competency to stand trial in 1997.

In this IAC claim, Hall said his trial counsel should have moved for a competency hearing (based on his "substantial structural and functional brain damage" manifesting in behaviors "including belligerence and agitation with his counsel, the judge, and the victim's sister") to establish that Hall was "not capable of assisting in his defense." *Id*. at *18 (quotation marks omitted). Hall procedurally defaulted this claim by failing to raise it in the Tennessee courts but argued cause and prejudice to overcome the default, relying on *Martinez/Trevino* and alleging IAC by his post-conviction counsel. In the end, the district court accepted the State's rebuttal that Hall "was evaluated by five psychological experts throughout his state court proceedings, none of whom made findings that supported a theory of incompetence." *Id*. at *19 (citation omitted).

> [Hall] was evaluated by Western Mental Health and also by Middle Tennessee Health Institute and determined to be competent to stand trial. Lynn Zager, a clinical psychologist, also worked with defense counsel and made no determination that [Hall] was incompetent. Further she found no evidence to support an insanity defense. Additionally, in the seventeen years since [Hall]'s trial, he has been evaluated by neuropsychologist Pamela Auble, psychiatrist Keith Caruso, and psychiatrist Kimberly Stafford, none of whom expressed concerns about [his] competence. It was reasonable for [Hall]'s trial counsel to rely on the mental health professional's determination that their client was competent to stand trial.

*Id*. (citations omitted). Hall argued to the district court that "Dr. J. Douglas Bremner, a professor of psychiatry and behavioral sciences at Emory University School of Medicine, found that he

was not competent to stand trial," *id*. at *18, but after a careful review, the court explained that Bremner's conclusions about Hall's "competence c[a]me nine years after the trial of this matter and with no indication that Bremner ha[d] ever met [Hall]," *id*. at *20. The district court concluded:

> Given the initial determination of competence, the opinions of mental health professionals that evaluated [Hall] throughout his state court proceedings, and no finding or even question of mental incompetence being raised during that time, the [c]ourt does not find that trial counsel's performance was unreasonable in relying on the opinions of mental health professionals and failing to establish that [Hall] was incompetent to stand trial. [Hall]'s claim of ineffective assistance of counsel related to failure to establish [his] incompetence is not substantial. The claim is procedurally defaulted and DENIED.

*Id*. The district court issued a final judgment.

Hall appealed again (No. 15-5436), and our COA specified three issues: (1) "whether the prosecution violated *Brady v. Maryland*, 373 U.S. 83 (1963), by withholding evidence of [state witness] Chris Dutton's mental illness"; (2) "whether trial counsel w[ere] ineffective for failing to challenge Hall's competency to stand trial"; and (3) "whether trial counsel rendered ineffective assistance of counsel by failing to present evidence of Hall's family and social history."[1]

## II.

The district court held that Hall procedurally defaulted two of the claims before us in this appeal—his *Brady* claim and his IAC claim involving his competency to stand trial. In an appeal of a district court's finding of procedural default, "we review the district court's legal conclusions de novo and its findings of fact for clear error." *Scott v. Houk*, 760 F.3d 497, 503 (6th Cir. 2014).

A § 2254 petitioner is generally barred from asserting claims in federal court that have been "procedurally defaulted." *Woodford v. Ngo*, 548 U.S. 81, 93 (2006). "In habeas, the

---

[1]We initially certified four claims for appeal, but Hall subsequently moved to dismiss one of his claims. We granted that motion and formally acknowledge so here. In the meantime, Hall had moved to expand the COA to add claims based on *Buck v. Davis*, 137 S. Ct. 759 (2017), and *Turner v. United States*, 137 S. Ct. 1885 (2017). We denied that motion.

sanction for failing to exhaust properly (preclusion of review in federal court) is given the separate name of procedural default" and "state-court remedies are described as having been 'exhausted' when they are no longer available, regardless of the reason for their unavailability." *Id*. at 92-93 (citations omitted). To overcome a procedural default (here, the failure to exhaust properly), a petitioner must "demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law[] or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

The other claim before us in this appeal is Hall's IAC claim concerning evidence of his family and social history. The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) provides the standard for our review of that claim. Under AEDPA, the federal court may overturn a state-court conviction if the last reasoned opinion from the state court that adjudicated the challenged issue on the merits "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or . . . resulted in a decision that was based on an unreasonable determination of the facts." 28 U.S.C. § 2254(d).

To prevail under the "contrary to" clause, a petitioner must show that the state court "arrive[d] at a conclusion opposite to that reached by [the Supreme] Court on a question of law" or "confront[ed] facts that are materially indistinguishable from a relevant Supreme Court precedent and arrive[d] at a result opposite" to that reached by the Court. *Williams v. Taylor*, 529 U.S. 362, 405 (2000). To prevail under the "unreasonable application" clause, a petitioner must show that "the state court identifie[d] the correct governing legal principle from th[e] Court's decisions but unreasonably applie[d] that principle to the facts of the [petitioner's] case." *Id*. at 413. "[A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Renico v. Lett*, 559 U.S. 766, 773 (2010) (quotation marks omitted). It is not enough that "the federal habeas court might conclude in its independent judgment that the state court applied clearly established federal law erroneously or incorrectly." *Gagne v. Booker*, 680 F.3d 493, 513 (6th Cir. 2012) (en banc) (internal quotation marks, editorial marks, and citation omitted). The relevant state-court decision must have applied clearly established federal law in an objectively unreasonable manner, *Renico*, 559 U.S. at 773, such that its

decision "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement," *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

## A.

Hall claims the state prosecutor violated *Brady v. Maryland*, 373 U.S. 83 (1963), by withholding impeachment evidence—i.e., records of a key prosecution witness's history of mental illness—and that he has overcome his procedural default because "a petitioner who proves a *Brady* violation demonstrates cause and prejudice to excuse procedural default of the *Brady* claim." *Brooks v. Tennessee*, 626 F.3d 878, 891 (6th Cir. 2010) (citing *Banks v. Dretke*, 540 U.S. 668, 691 (2004)). On review, we may set aside a district court's factual findings only if they are clearly erroneous, "but [we] will review an alleged *Brady* violation de novo because whether a *Brady* violation occurred is a mixed question of law and fact." *Id.* (quotation marks and citation omitted).

To prevail on a *Brady* claim, Hall must prove three elements: "[1] The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; [2] that evidence must have been suppressed by the State, either willfully or inadvertently; and [3] prejudice must have ensued." *Banks*, 540 U.S. at 691 (quoting *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999)). The evidence at issue here comprises prison records that document Dutton's history of mental illness, which the State concedes could impeach Dutton, so it satisfies the first element. *See Wilson v. Sheldon*, 874 F.3d 470, 478 (6th Cir. 2017) ("Impeachment evidence is also encompassed within the *Brady* rule because a jury's reliance on the credibility of a witness can be decisive in determining the guilt or innocence of the accused."). The district court found that Hall did not satisfy the second element however.

The prosecution never had actual possession or actual knowledge of these records because only TDOC has these records. Nor does Hall contend that it did. Instead, Hall's claim rests on the prosecutor's duty under *Brady* to investigate, discover, obtain, and disclose certain exculpatory or impeachment evidence, namely the prosecutor's "duty to learn of any favorable

evidence known to the others acting on the government's behalf in the case, including the police." *Kyles v. Whitley*, 514 U.S. 419, 437 (1995).

In his appellate briefing, Hall argues that *Kyles* required the prosecutor to learn of Dutton's mental health records from the TDOC (and disclose them to Hall) because the TDOC was either acting on the prosecutor's behalf or the TDOC and the prosecution were working together to hold Hall in custody, convict him, and incarcerate him—given that the TDOC conveyed Dutton's offer of testimony to the prosecutor and coordinated his attendance as a prosecution witness at Hall's trial. But, in the district court, Hall "d[id] not allege . . . any connection between the TDOC and the prosecution in the investigation of this case, and none [wa]s apparent from the record," so the district court found "no basis for imputing knowledge of the mental health information in Dutton's TDOC records to the prosecution." As a finding of fact, this was not clearly erroneous and we have no basis to disturb it. As a legal theory, Hall forfeited this theory by failing to raise it to the district court. *See Frazier v. Jenkins*, 770 F.3d 485, 497 (6th Cir. 2014) ("Generally, we will not address arguments raised for the first time on appeal."). But, even assuming he had raised and preserved it, Hall does not cite any Supreme Court or Sixth Circuit precedent holding that the relationship between the jailor and the prosecutor is analogous to that between the police and the prosecutor, *see Kyles*, 514 U.S. at 437, such that the jailor necessarily acts on the prosecutor's behalf by incarcerating the defendant during trial, conveying a message from an inmate, or transporting the defendant and inmate-witness to trial.

Similarly, Hall does not cite any Supreme Court or Sixth Circuit precedent to support his proposition that *Brady* imputes this type of knowledge from the jailor to the prosecutor because both are acting under the same sovereign.[2] Instead, Hall relies on four out-of-circuit cases, three of which were decided after Hall's 1997 trial; the fourth, while decided in 1989, was an

---

[2]The Sixth Circuit has not precisely answered this question in a published opinion. *See United States v. Ramer*, 883 F.3d 659, 674 (6th Cir. 2018) (declining to address the question of whether "the government's *Brady* obligation created a duty for DFI's criminal prosecutors to learn of the civil division's file on Cornell"). However, in *Gulf v. Bagley*, 601 F.3d 445, 476 (6th Cir. 2010), we found that federal authority supported the proposition that a state prosecutor was not required "to inquire into the federal prosecution of a witness that is unrelated to the state case and that does not involve any persons acting on behalf of the state prosecutor." And "we have rejected *Brady* claims premised on evidence possessed by uninvolved government agencies." *Sutton v. Carpenter*, 617 F. App'x 434, 441 (6th Cir. 2010).

unpublished, two-page, per curiam ruling on a summary dismissal of a pre-AEDPA habeas petition. Moreover, these opinions do not even say what Hall represents them to say.

The first, *United States v. McGill*, 815 F.3d 846 (D.C. Cir. 2016) (per curiam), would mean—according to Hall's brief—that "where the defendant was being prosecuted by the United States, a 'psychological evaluation and a prison disciplinary report for a key government witness' should have been disclosed to the defense under *Brady.*" But *McGill* says no such thing; instead, the *McGill* court rejected a claim "that the government's failure to disclose the impeachment evidence violated *Brady,*" explaining that the records were inadmissible at trial and "could not have resulted in any cognizable prejudice" because they were inapplicable, stale, or cumulative, as to the individual charge. *McGill*, 815 F.3d at 922-23. More to the point, the *McGill* opinion did not address anything to do with Hall's premise of necessary imputation: it is likely, albeit wholly undiscussed, that the *McGill* prosecutor had actual possession of the records at issue and withheld them for the reasons stated in the opinion.

Hall's next case is *Gonzalez v. Wong*, 667 F.3d 965, 981 (9th Cir. 2011), in which the witness's "psychological reports were in the possession of the prosecutor's office prior to the trial" and the prosecution conceded that it had suppressed them. This is factually distinguishable.

The third case, *Carriger v. Stewart*, 132 F.3d 463, 479-80 (9th Cir. 1997) (en banc), provides some support for Hall's position about the state's "obligation, before putting [its witness] on the stand, to obtain and review [that witness]'s corrections file, and to treat its contents in accordance with the requirements of *Brady.*" But the *Carriger* court found a *Brady* violation based in part on the fact that "Dunbar was the prosecution's star witness, and was known by police and prosecutors to be a career burglar and six-time felon, with a criminal record going back to adolescence." *Id.* Given the prosecution's reliance his testimony at trial, it had an "obligation to turn over all information bearing on that witness's credibility," including his corrections file. *Id.* In contrast, Dutton's testimony was not crucial to the prosecution's case in Hall's trial.

The final case, *Sledge v. Moore*, 878 F.2d 1431 (4th Cir. 1989) (unpublished table opinion), would mean—according to Hall's brief—"that in a state prosecution, 'prison records of the prosecution's witnesses' were encompassed by the prosecution's *Brady* obligation, because such 'impeachment evidence is exculpatory in nature and should be provided to the defense pursuant to *Brady*." But this was the aforementioned two-page, per curiam ruling on the summary dismissal of a pre-AEDPA habeas petition on the finding that it was "frivolous." *Sledge* does not address anything to do with Hall's premise of necessary imputation: it is likely, albeit undiscussed, that the *Sledge* prosecutor had actual possession of the records.

The aforementioned cases do not support Hall's contention that the prosecutor had a duty to investigate, discover, and obtain Dutton's mental health records from the TDOC. And these cases certainly provide no clearly-established law that would guide a Tennessee prosecutor at the time of Hall's criminal trial in February 1997. Hall concedes that the Sixth Circuit "has held in various cases that under *Kyles*, a prosecutor does not have a duty to secure evidence from another sovereign (or state agency) that had no involvement whatsoever in a particular case," but argues that in this case the TDOC *was* involved. Regardless, Hall's view would leave our precedent, at best, undecided.

We are not inclined to break new ground by holding that the prosecutor has an affirmative duty to pursue and obtain psychological records for its witnesses, even inmate witnesses, but even if we were, Hall cannot show prejudice, the third *Brady* element. To prove prejudice, Hall must show that the suppressed evidence is "material," meaning that there is "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985).

Dutton testified that Hall had confided in him about the murder, which provided evidence of Hall's guilt and his mental state, including his premeditation. According to Dutton, Hall told him that he had disconnected the phone line in anticipation that Billie Jo would call the police if they argued and that, when she refused to consider his pleas for reconciliation and demanded that he leave, his temper got the best of him and he began to strike her; eventually he panicked, threw her in the pool, and fled. Dutton further testified that, by Hall's own admission, Hall had determined before he arrived at Billie Jo's house "to make her . . . suffer as he did, feel the

helplessness that he was feeling because she took his world away from him." On cross-examination, Dutton testified that Hall had also told him that he was depressed and had been drinking that day, and was very concerned about his daughters' welfare, especially the youngest with cerebral palsy. Hall's counsel effectively impeached Dutton, revealing that Dutton had several felony convictions for burglary and theft, had previously given information to law enforcement in exchange for favors, and had been promised that the prosecutor would speak on his behalf at his parole hearing if he testified truthfully at Hall's trial.

A petitioner does not prove materiality, for purposes of demonstrating prejudice, when the potentially exculpatory evidence is "merely cumulative" to information presented at trial to impeach his credibility. *See Brooks v. Tennessee*, 626 F.3d 878, 893-94 (6th Cir. 2010); *Carter v. Mitchell,* 443 F.3d 517, 533 n.7 (6th Cir. 2006). While records of Dutton's mental illness would have impeached his general credibility, the jury was already aware that he was a criminal willing to trade testimony for favors—and was doing so in this case—and the mental-health records did not undermine his specific testimony.

Three of Billie Jo's daughters testified and their testimony corroborated Dutton's testimony about Hall's guilt and premeditation. More importantly, the evidence against Hall was overwhelming even without Dutton's testimony—Hall disconnected the phone lines, told the daughters that he was "going to kill mama," and inflicted 83 separate wounds, including defensive wounds, target wounds, several blows to the head, a fractured nose, multiple lacerations, and bruises and abrasions to the chest, abdomen, genitals, arms, legs, and back. *See Jalowiec v. Bradshaw*, 657 F.3d 293, 313 (6th Cir. 2011) ("Evidence withheld by the prosecution must be evaluated in the context of the entire record." (citation and quotation marks omitted)).

Because Hall cannot prove all three elements of *Brady*, he cannot win a substantive *Brady* claim and, therefore, cannot establish cause and prejudice to overcome his procedural default.

**B.**

Hall's trial counsel did not challenge his competency to stand trial, nor did Hall's subsequent counsel raise this in his state post-conviction proceedings. Hall claims that, as a

result, both rendered ineffective assistance of counsel (IAC). He claims that IAC by his trial counsel entitles him to habeas relief and IAC by his post-conviction counsel overcomes procedural default. *See Martinez*, 566 U.S. at 14 ("[A] prisoner may establish cause for a default of an [IAC] claim . . . where appointed counsel in the initial-review collateral proceeding . . . was ineffective under the standards of *Strickland.*"). "To overcome the default, a prisoner must also demonstrate that the underlying [IAC] claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit." *Id.*; *see also Strickland v. Washington*, 466 U.S. 668, 687 (1984) (stating that, to prove an IAC claim, the petitioner "must show that [his counsel's] deficient performance prejudiced [his] defense"). Here, the question is whether *Strickland* required Hall's post-conviction counsel—under an objective standard of reasonableness—to raise trial counsel's failure to challenge competency as an IAC error for state-court consideration on post-conviction review.

The district court found that, prior to trial, both Western Mental Health and the Middle Tennessee Mental Health Institute (MTMHI) evaluated Hall and declared him competent to stand trial. Specifically, MTMHI assessed Hall's mental condition, his dependency on alcohol and drugs, and his intellectual functioning. In March 1995, MTMHI reported:

> After completion of the competency evaluation, the staff has determined that Mr. Hall's condition is such that he is capable of adequately defending himself in a court of law. In making this determination, it was concluded that he does understand the charges pending against him and the consequences which might follow, and he is able to advise counsel and participate in his own defense.

MTMHI further found that Hall did "not meet the criteria for an insanity defense." Similarly, the defense team's clinical psychologist, Dr. Zager, who evaluated Hall and testified in his defense both in the guilt phase and the sentencing phase of trial, never suggested that he was incompetent to stand trial and found nothing to support an insanity defense. During state post-conviction proceedings, three more experts (neuropsychologist Pamela Auble, psychiatrist Keith Caruso, and psychiatrist Kimberly Stafford) evaluated and opined about Hall, but none suggested that he had been incompetent to stand trial. The district court found that Hall's trial and post-conviction counsel relied on these expert opinions. *Hall*, 2015 WL 1464017, at *20. Because these findings are not clearly erroneous, we must accept them. *See Brooks*, 626 F.3d at 891.

Hall argues that, despite these formal evaluations and expert opinions, his behavior was so bizarre and outlandish that a reasonable attorney would have necessarily questioned his competence. He relies on anecdotal statements from four of his attorneys. One described him as being "very emotional," "waving his arms and yelling loudly," that "[n]either [his] thoughts nor his behaviors appeared to be rational," and being "non-cooperative with the judge." Another described him as engaging in "tirade[s] on issues that made little sense, followed by explosion[s] of anger," and unable to engage in "productive conversation" with counsel. A third described him as "childlike," "petulant," "naïve about the legal system, and confused about what was happening to him and why." And a fourth described him as "highly agitated," angry, and "difficult to calm down."

But Hall's pretrial and trial counsel were entitled to rely upon the opinions of experts to determine Hall's competency to stand trial. *See Morris v. Carpenter*, 802 F.3d 825, 841-42 (6th Cir. 2015); *see also Taylor v. Horn*, 504 F.3d 416, 438-39 (3d Cir. 2007) (rejecting an IAC claim for not seeking competency evaluation where counsel reasonably relied on expert evaluations that found the defendant competent); *Holladay v. Haley*, 209 F.3d 1243, 1250-51 (11th Cir. 2000) (approving of counsel's reliance on one evaluation and decision not to pursue another); *Galowski v. Berge*, 78 F.3d 1176, 1182 (7th Cir. 1996) (rejecting an IAC claim for counsel's failing to seek a competency hearing when a defense expert determined the defendant was competent); *Moran v. Godinez*, 57 F.3d 690, 699-700 (9th Cir. 1994), *superseded on other grounds by AEDPA* ("These psychiatrists provided detailed, reasoned reports which contained their individual opinions that Moran was competent to stand trial. Moran's attorneys were entitled to rely on these reports."); *Butler v. Davis*, 745 F. App'x 528, 532 (5th Cir. 2018), cert. denied, 139 S. Ct. 1545 (2019) ("[A]ttorneys may rely on the opinion of experts in assessing a defendant's mental health.").

When counsel rely on such experts—as they are entitled to do—their performance cannot be said to fall below the objective standard of reasonableness that *Strickland* requires. So too here. By relying on the opinions of the mental health experts, Hall's attorneys acted reasonably, and their decision to accept Hall's mental competency, without a formal hearing, was not deficient. For these reasons, Hall has not established a "substantial" IAC claim against his trial

counsel on this basis, and his post-conviction counsel did not render ineffective assistance by failing to raise it.  Hall therefore cannot overcome his procedural default under *Martinez.*

## C.

Hall's last IAC claim is that his trial counsel conducted an inadequate investigation and presented insufficient evidence regarding his family and social history.  Specifically, he says trial counsel should have had his family members testify about his (1) mental disorder that caused his unruly behavior, (2) family's history of alcoholism, and (3) automobile and motorcycle accidents that might have involved "potential" head injuries;[3] and claims that, had counsel done so, it is probable that at least one juror would have voted for life instead of death.  It bears mention that this is not the way Hall argued this issue in the state and district courts.[4]  *See Frazier*, 770 F.3d at 497 ("Generally, we will not address arguments raised for the first time on appeal.").

But this claim would fail anyway under AEDPA review, particularly given that our review of an IAC claim under both *Strickland* and AEDPA is "doubly deferential."  *Morris*, 802 F.3d at 841 (quoting *Burt v. Titlow*, 571 U.S. 12, 15 (2013)).  That is, Hall must show, based on the evidence that was before the state court, *see Cullen v. Pinholster*, 563 U.S. 170, 181 (2011), that counsel's performance was deficient and that deficiency prejudiced his defense, *Strickland*, 466 U.S. at 687, and that the state court's decision that it was not deficient or did not prejudice him was "contrary to" or "an unreasonable application of" clearly established Supreme Court precedent, 28 U.S.C. § 2254(d)(1).  Because AEDPA review "is limited to the record that was before the state court that adjudicated the claim on the merits," *Cullen*, 563 U.S. at 181, only

---

[3] Hall also argues that that trial counsel should have produced family members to testify that Billie Jo had been physically, mentally, and emotionally abusive to him.  In his state post-conviction proceedings, however, Hall asserted this as a separate claim titled "Counsel failed to establish the victim as the aggressor," *Hall*, 2005 WL 22951, at *28-29, and correspondingly raised it to the district court as a separate claim with the same title.  Because we did not grant Hall a COA on that claim, we will not entertain it.  *See Mitchell v. MacLaren*, 933 F.3d 526, 539 n.4 (6th Cir. 2019).

[4] In those courts, Hall argued that his trial counsel had failed to obtain and provide this family and social history evidence for Dr. Zager "to demonstrate that Hall was not capable of forming the intent required for first degree murder and . . . to mitigate a sentence of death."  The district court found, as the Tennessee Court of Criminal Appeals had found during Hall's post-conviction proceedings, that Hall failed to prove that his counsel did not provide Dr. Zager with all relevant information, and added that, while a more complete social history might have provided more detail, the evidence presented would have been repetitive.

the evidence presented there is relevant to our review here. *See Moore v. Mitchell*, 708 F.3d 760, 786 (6th Cir. 2013).

On direct appeal, the Tennessee Supreme Court reported that, during the sentencing phase:

> [Hall] also presented his three sisters and his mother to recount the history of [Hall] and his family. [Hall] was the youngest of seven children. His father, an alcoholic, physically and verbally abused his wife until he died from a heart attack in 1974 when [Hall] was ten. [Hall]'s father [had] denied that [Hall] was his son and snubbed [Hall]. The witnesses' descriptions of the fights between [Hall]'s parents eerily paralleled [Hall]'s final confrontation with his own wife. All of [Hall]'s relatives described him as a good father who loved his children.

*Hall*, 8 S.W.3d at 599. During post-conviction, the Tennessee Court of Criminal Appeals reported:

> During the guilt phase . . . , trial counsel presented the testimony of Dr. Lynn Zager, a clinical psychologist[, who] diagnosed [Hall] as depressed and suffering from alcohol dependence. She further observed personality characteristics of paranoia and dependency. In her professional opinion, she believed that [Hall] suffered from depression and alcohol intoxication at the time of the killing. She found these factors were compounded by his personality characteristics and various psycho-social stressors, including a sick child, loss of employment with the resulting financial problems, his impending divorce, and the terminal illness of a brother. She concluded that [Hall] acted in an impulsive manner in killing his wife, rather than pursuant to a preconceived plan.
>
> Dr. Zager testified again during the penalty phase along with Dr. Joe Mount, a psychological examiner who counseled [Hall] at Riverbend Maximum Security Institution. Both doctors described him as depressed, remorseful, suicidal and extremely concerned about his children. Dr. Mount testified that [Hall] had been diagnosed as suffering from an adjustment disorder with mixed emotional features and substance abuse of dependence by history.

*Hall*, 2005 WL 22951, at *31 (quotation marks and citations omitted). The district court, therefore, concluded:

> Hall's mother and three sisters have testified about the alcoholism, physical and psychological abuse that he experienced as a child[,] and the fact that his father mistreated him because he did not believe [Hall] was his son. The evidence that [Hall] contends could have been obtained from a more complete social history may provide more detail, but it would have been repetitive of what was already

presented. To the extent that counsel may have been deficient in obtaining a social history, [Hall] was not prejudiced.

Hall has not convinced us that it would have necessarily helped, and not hurt, his defense for his trial counsel to have had his family members provide lay testimony about Hall's mental disorders, even more testimony about the family's alcoholism, and gratuitous testimony about past accidents that only "potentially" involved head injuries. Trial counsel's decisions to include or exclude such testimony are inherently strategic and "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; [while] strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690–91. It is far from clear that trial counsel's decision here was objectively unreasonable or amounted to deficient performance. Regardless, this additional testimony would only have been cumulative or repetitive and, therefore, would not satisfy the prejudice requirement under *Strickland*. Finally, even if Hall's assessment were correct, the state court's judgment would not be "so lacking in justification" as to be "beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103. This claim fails.

In this appeal, Hall also accuses post-conviction counsel of IAC for failing to introduce more and different family- and social-history evidence at the post-conviction evidentiary hearing. Hall attempts to introduce this now, despite its apparent procedural default, based on his interpretation of the *Martinez* exception. Putting aside that Hall did not raise this in the district court, we have already rejected this legal theory. *See Moore*, 708 F.3d at 785.**5**

**III.**

For the foregoing reasons, we AFFIRM the judgment of the district court.

---

**5**Hall contends that *Moore* was incorrectly decided, though he concedes that this panel cannot overrule it. *See United States v. Ferguson*, 868 F.3d 514, 515 (6th Cir. 2017), *cert. denied*, 139 S. Ct. 2712 (2019) ("One panel of this court may not overrule the decision of another panel; only the *en banc* court or the United States Supreme Court may overrule the prior panel."). He raises this contention here to preserve it for possible future review.